IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SOPHIE PUSKAR,<br><br>                *Plaintiff*,<br><br>v.<br><br>WESTMORELAND COUNTY and<br>WEXFORD HEALTH SOLUTIONS, INC.,<br><br>                *Defendants*. | Civil Action No. 2:19-cv-1235<br><br>Hon. William S. Stickman IV |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

      Plaintiff Sophie Puskar ("Puskar") initiated this employment discrimination/wrongful termination action on September 26, 2019, against Defendants Westmoreland County and Wexford Health Solutions, Inc. ("Wexford"). (ECF No. 1). An Amended Complaint followed on February 4, 2020, and then a Second Amended Complaint was filed on April 1, 2020. (ECF Nos. 25 and 43). Puskar withdrew all of her claims against Wexford and it was terminated as a party in this case. (ECF Nos. 78 and 79). Puskar alleges that Westmoreland County discriminated against her in violation of Title VII of the Civil Rights Act of 1964 on the basis of her sex (Count I), that it permitted a sexually hostile work environment (Count II), and that it retaliated against her for engaging in a protected activity (Count III). In Count IV, she alleges a violation of Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S. § 951 *et seq.*, because of her sex. (ECF No. 43). Westmoreland County has sought summary judgment in its favor arguing that the evidence failed to establish the requisite employer-employee relationship. (ECF

Nos. 63 and 64). For the reasons set forth below, the Court will grant Westmoreland County's motion.

## I. FACTUAL BACKGROUND

Westmoreland County has a contract with Wexford for it to provide medical and nursing services to inmates of the Westmoreland County Prison. A separate medical unit exists at the Westmoreland County Prison and a Wexford employee with supervisory and disciplinary authority over Wexford employees remains on site. Wexford and its employees are categorized as independent contractors of the Westmoreland County Prison. Pursuant to the contract, all Wexford employees assigned to the prison have to undergo a background investigation and drug screening. They are not permitted to have any relatives or relationships with any persons imprisoned. Wexford employees must abide by the prison's security rules and regulations, and the prison retains the authority to revoke a Wexford employee's clearance to enter the facility if that person has "created or could potentially create a security risk [. . .]." (ECF No. 63-1, pp. 6, 28-29, 33; ECF No. 65, ¶¶ 1-2, 12; ECF No. 63-4, p. 13 ). In the past, Westmoreland County Prison removed the security clearances of Wexford employees who brought contraband into the prison thereby barring their access. (ECF No. 63-4, p. 13).

Puskar was employed by Wexford as an at-will LPN beginning in January of 2017 until October 27, 2019. Her compensation package – i.e., her paychecks, health benefits, pension, and vacations days – were provided by Wexford. (ECF No. 63-3, pp. 6, 21). She was assigned to the Westmoreland County Prison, and a Wexford supervisor prepared her schedule. (ECF No. 65, p. 13; ECF No. 63-1, p. 31). She kept track of her hours by utilizing a time-clock monitored by Westmoreland County. (ECF No. 77-4, ¶ 5). Puskar testified during her deposition that she "worked for Wexford," and she "worked for Wexford but in the Westmoreland County Prison."

2

(ECF No. 63-3, pp. 20-21).[1] At the prison, her primary duties involved the administration of medication to inmates. (ECF No. 65, ¶ 3, 9). Pursuant to the contract between Westmoreland County and Wexford, Puskar was classified as an employee of Wexford. (ECF No. 65, ¶¶ 3, 6; ECF No. 75, ¶¶ 20-22). The contract specifically stated:

> At the time of orientation and thereafter, WEXFORD shall clearly instruct and impress upon all employees assigned to work at the Westmoreland County Prison that they are employed only by WEXFORD, and not by the County of Westmoreland [. . .].

(ECF No. 63-1, p. 33). Puskar testified during her deposition that she signed a document acknowledging her receipt of an Employee Handbook and Business Code of Conduct from Wexford, but she never read the documents. (ECF No. 63-3, pp. 6-7). The prison provided Puskar with instructions regarding security measures to be followed inside the prison, and she attending a training session explaining security policies and procedures, including those regarding dispensing medication to inmates inside the facility. (ECF No. 65, ¶¶ 3, 9; ECF No. 63-1, p. 32; ECF No. 63-3, pp. 6-7; ECF No. 63-4, p. 18). Westmoreland County, consistent with the contract, retained the authority to review and approve medical policies and procedures in "areas that impact security and general administration of the Prison." (ECF No. 63-1, p. 7). Wexford employees were contractually obligated to report "any problems and/or unusual incidents to the Warden or his designee immediately." (ECF No. 63-1, p. 30).

In the fall of 2018, an inmate, Jadrian Wade ("Wade"), continuously made sexually inappropriate comments to Puskar and made her gifts of roses created from toilet paper. She advised various correctional officers on multiple occasions when these events occurred. On

---

[1] The contract between Westmoreland County and Wexford specifically states that, "the COUNTY, the Westmoreland County Prison Board, and their officers and employees assume no responsibility for any personnel decisions regarding WEXFORD's employees." (ECF No. 63-1, p. 29). It is replete with language emphasizing that Wexford employees are not employees of the prison and should not hold themselves out to be. (*see generally* ECF No. 63-1).

3

September 25, 2018, Wade made several sexually explicit comments to Puskar while she was on the D Unit distributing medication. Despite asking multiple times for Wade to be removed by Corrections Officer ("CO") Hannah, CO Hannah did not make Wade return to his cell. As Puskar attempted to exit the unit, Wade grabbed her left buttock. Puskar reported this incident to her Wexford supervisor, Health and Services Administrator Emily Zyniewicz, who instructed her to also report the incident to the sergeant on duty for the prison because it involved security matters. Puskar made a verbal and written complaint. Formal charges were initiated against Wade, and he was prosecuted, convicted and sentenced for his actions against Puskar. (ECF No. 63-3, pp. 9-10; ECF No. 77-5). CO Hannah was verbally counseled about enforcing the medication policy in that only a certain number of inmates could be out of their cells at a time. (ECF No. 63-4, pp. 2-124).

On October 17, 2018, when Puskar attempted to distribute medication on CO Hannah's unit, he requested Puskar's Medication List. When she stated she did not have one, he requested that she go and obtain one. When she returned, an interaction between the two occurred utilizing profanity that resulted in both Puskar and CO Hannah filing complaints against each other. Puskar was disciplined by Wexford for her failure to adhere to the applicable medication policy and for using inappropriate language. Corrections CO was not disciplined by the Westmoreland County Prison as he followed the prison's security protocols as to medication dispensation. (ECF No. 63-3, 10-13; ECF No. 63-4, pp. 20, 22-25; ECF Nos. 77-6, 77-7; ECF No. 63-2, pp. 28-34).

Between October 17, 2018 and June 23, 2019, Puskar had no incident with inmates or correctional officers. She made no formal complaints that any correctional officers utilized profanity against her. (ECF No. 63-3, pp. 15).

4

According to Puskar, she submitted a third complaint on June 23, 2019, regarding CO Hannah's unprofessional conduct toward her. (ECF No. 75, ¶ 44). Furthermore, she alleges that at some point between June of 2019 and October of 2019, a CO pounded on a table during her disbursement of medication and prolonged her interaction with inmates, CO Hannah called her a "fucking bitch" at some point, and that CO Hannah referred to her as a "bitch on multiple occasions." (ECF No. 63-3, pp. 16, 19). No written reports or formal complaints exist documenting Puskar reporting being called a bitch. (ECF No. 63-3, pp. 16). Westmoreland County Prison Deputy Warden George Lowther had no recollection of Puskar reporting the tapping/pounding incident, and he received no complaints from her that COs were treating her in a hostile manner. (ECF No. 63-4, pp. 89-90).

Puskar submitted a Letter of Resignation to Wexford on October 11, 2019, stating that she was leaving her employment on October 27, 2019. (ECF No. 63-3). She never explained to Wexford why she was leaving. During her deposition, Puskar testified that she left employment with Wexford to pursue another job with a higher salary that she felt was a better opportunity. (ECF No. 63-3, pp. 17-18, 20). Puskar also testified that she planned to leave her position even without a pending offer, because of "everything that happened and Wexford not backing anybody up on anything." (ECF No. 63-3, p. 18).

## II. STANDARD OF REVIEW

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). *See also Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided in order to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof," will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).

### III. ANALYSIS

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. A Title VII plaintiff must be an "'employee' who 'may invoke [Title VII's] ... protections against discrimination[.]'" *Mariotti v. Mariotti Bldg. Prods., Inc.*, 714 F.3d 761, 766 (3d Cir. 2013) (alterations in original) (quoting *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 446 n.6 (2003)). Thus, in order for Puskar to prevail on her Title VII claims and PHRA claim,[2] she must demonstrate the existence of an "employment relationship" with Westmoreland County. *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013).

Title VII defines an employee as "an individual employed by an employer." 42 U.S.C. § 2000e. The Supreme Court has noted that the statutory definition is "completely circular and

---

[2] Claims brought under the PHRA are generally "'interpreted coextensively with Title VII claims.'" *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 179 n. 1 (3d Cir. 2009) (quoting *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n. 6 (3d Cir. 2006)). Therefore, the Court applies the same analysis to Puskar's claims under both Title VII and the PHRA.

explains nothing." *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). In *Darden*, the Supreme Court outlined a common-law test that applies in the Title VII context. *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 213 (3d Cir. 2015) (citing cases). The Supreme Court directed, "'[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.'" *Darden*, 503 U.S. at 323 (citation omitted). *Darden* provides a non-exhaustive list of relevant factors, including,

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 323–24 (citation omitted). No one factor in the analysis is decisive. *Id.* at 324. In *Covington*, the United States Court of Appeals for the Third Circuit condensed the *Darden* factors into the following test, which "focus[es] the employment relationship analysis on 'the level of control the defendant[s] ... exerted over the plaintiff'" by asking whether the defendant: (1) paid the plaintiff; (2) hired or fired the plaintiff; and (3) maintained control over the plaintiff's daily activities. *Covington*, 710 F.3d at 119 (second alteration in original) (citation and internal quotation marks omitted). The burden of establishing an employment relationship for the purposes of Title VII claims falls upon the plaintiff. *E.E.O.C. v. Zippo Mfg. Co.*, 713 F.2d 32, 35 (3d Cir. 1983).

"Whether a worker is an 'employee' is a question of law to be determined by the court in the absence of disputed material underlying facts." *Holtzman v. The World Book Co., Inc.*, 174 F.Supp.2d 251, 254 (E.D. Pa. 2001) (citing *Cox v. Master Lock Co.*, 815 F.Supp. 844, 845 (E.D.

7

Pa. 1993), *aff'd* 14 F.3d 46 (3d Cir. 1993)). *See also Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 352 (6th Cir. 2011) ("The determination of employment status is a mixed question of law and fact. Normally, a judge will be able to make this determination as a matter of law.") (quoting *Lilley v. BTM Corp.*, 958 F.2d 746, 750 n. 1 (6th Cir. 1992)); *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207, 213 (3d Cir. 1993) (employer-employee status is a mixed question). While the parties here dispute the legal conclusions to be drawn from the factual evidence they have submitted, they offer no contradictory factual evidence. At the summary judgment stage, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences therefrom. Even given this generous vantage point, the evidence before the Court does not constitute a sufficient basis to find as a matter of law that Puskar was engaged in an employment relationship with Westmoreland County, rather, it shows the exact opposite.

As to the first prong of the test set forth in *Covington*, no genuine issue of material fact exists that Wexford, not Westmoreland County, paid Puskar. Wexford also provided Pusker with her health benefits, pension, and vacations days. (ECF No. 63-3, pp. 6, 21).

As to the second prong, there is no genuine issue of material fact that Westmoreland County did not hire or fire Puskar. The record is clear that Wexford hired Puskar, and she submitted her Letter of Resignation to Wexford on October 11, 2019, stating that she was leaving her employment with Wexford on October 27, 2019. (ECF No. 63-3).

As to the third prong of the *Covington* test, nothing in the record suggests that Westmoreland County exercised day-to-day control or supervision over Puskar's activities as a nurse. The clearest expression of the relationship between Wexford and Westmoreland County as to Wexford's employees assigned to the prison is the contract. It is abundantly evident that

Wexford was selected to act as an independent contractor to provide medical services to inmates of the prison. In addition to providing medical, dental, and mental health services to all inmates, and operating a six bed medical infirmary unit at the prison, the contract provided that Wexford would purchase and maintain all the necessary medical and pharmaceutical supplies and equipment. (*See generally* ECF No. 63-1).

There is little dispute that Puskar's daily activities as a nurse were supervised by the Wexford supervisor on site at the prison, and not by any Westmoreland County employees. She held a skilled position - a registered nurse – and no prison employees possessed control over Puskar's nursing functions. Under the contract, neither Westmoreland County nor its personnel at the prison could terminate, assign or direct any Wexford employees. The contract specified, "[t]he COUNTY, the Westmoreland County Prison Board, and their officers and employees assume no responsibility for any personnel decisions regarding WEXFORD's employees." (ECF No. 63-1, p. 29).

Wexford was responsible for designing and implementing "policies, procedures and protocols for the health care unit and medical staff," and "fixing hours and days of work for its employees, and shall inform the Prison administration of employees' work schedules." (ECF No. 63-1, pp. 30, 31). The prison had no role in what specific areas within the prison Wexford medical staff were assigned to and worked on a daily basis. (ECF No. 63-4, pp. 74-75). Wexford was also responsible for providing "appropriate in-service educational programs for its health care staff," providing all new health care employees with orientation regarding medical procedures on-site at the prison, maintaining personnel files for those assigned to work at the prison, and it was "WEXFORD's sole responsibility to monitor the performance of its health care staff to ensure completion of responsibilities [. . .]." (ECF No. 63-1, pp. 30, 32-33). The

Wexford Health and Services Administrator at the prison, Ms. Zyniewicz, possessed supervisory and disciplinary authority over Wexford employees assigned to the prison. (ECF No. 63-2, pp, 9-12). Deputy Warden Lowther had no supervisory authority over members of the medical staff assigned to the prison by Wexford; they were not employees of the prison. (ECF No. 63-4, p. 12). Any discipline Puskar received was through Wexford, and Deputy Warden Lowther did not keep files on any Wexford employees assigned to the prison. (ECF No. 63-4, pp. 81-82).

Westmoreland County's control over its property – the prison – and its ability to revoke a Wexford employee's security clearance at the prison does not point toward employee status with Westmoreland County. The Westmoreland County Prison had to retain such control for security, safety and administrative purposes. The contract specifically provided, "WEXFORD shall follow all established security policy and procedures." (ECF No. 63-1, p. 6). The various security provisions of the contract read in pertinent part:

> 4.5.4. <u>Compliance with Security Rules</u>  Initial and continued assignment of WEXFORD'S employees and contracted personnel to work at the Prison shall be subject to compliance with the Prison's security rules and regulations. WEXFORD will advise all of its employees and contracted personnel of their duty to comply with all security rules and regulations at the Westmoreland County Prison. It is hereby acknowledged that the imposition of these requirements on WEXFORD and its employees and contracted personnel in no manner changes the independent contractor status of WEXFORD and its employees and contracted personnel.
>
> 4.5.4.1 <u>Revocation of Security Clearance</u>  At any time that the Westmoreland County Prison Board or the Prison Warden determines that WEXFORD or any of its employees or contracted personnel have created or could potentially create a security risk at the Prison, the said Prison Board or Warden shall have the right to revoke any security clearance for such employee or contracted personnel. WEXFORD will so advise all of its employees and contracted personnel prior to assigning such persons to work at the Westmoreland County Prison. This relates solely to matters of security. The COUNTY, the Westmoreland County Prison Board, and their officers and employees assume no responsibility for any personnel decisions regarding WEXFORD's employees.

> 4.8.1   Facility Entry/Exit Procedures   All of WEXFORD's employees assigned to work at the Westmoreland County Prison shall be required to comply with sign-in/sign-out and other entry/exit procedures as specified by the Westmoreland County Prison. It is specifically understood that this shall include the submission to electronic scanning (walk through metal detectors and hand held scanners) and/or other reasonable searching of WEXFORD's employees and their personal belongings for prohibited items as they enter, move through and leave the Westmoreland County Prison.
>
> 4.8.2   Security Regulations and Procedures   WEXFORD's personnel shall be subject to all of the security regulations and procedures of the Westmoreland County Prison.  Failure to comply will result in loss of security clearance.

(ECF No. 63-1, pp. 29, 31, 32).  Thus, while Westmoreland County may have controlled who entered its property – the prison – and maintained security protocols, like revoking security clearances for people who "created or could potentially create a security risk [. . .]," it did not possess the right to terminate a Wexford employee's employment.  All the contract allowed for was the revocation of a Wexford employee's security clearance if they created or posed a security risk at the prison.  Further, as already noted, aside from assuring prison security protocols were adhered to, Westmoreland County employees could not control the manner and means by which Puskar accomplished her day-to-day nursing work.  All that was required was Wexford employees report "any problems and/or unusual incidents to the Warden or his designee immediately." (ECF No. 63-1, pp. 26, 30).

Puskar relies upon *Walker v. Correctional Medical Systems*, 886 F. Supp. 515, 520 (W.D. Pa. 1995) in support of her argument that she had an employment relationship with Westmoreland County.  In *Walker*, the district court concluded that, although many of the *Darden* factors weighed against the conclusion that Walker, a nurse employed by Correctional Medical Systems ("CMS") assigned to work at the Allegheny County Jail, was an employee of Allegheny County ("County") (CMS hired her, paid her, provided her benefits, supervised her,

reviewed her work, set her work schedule, and her work was not the regular business of the County Prison), other factors supported the conclusion that Walker was a County employee: she reported to work at the jail, received some supplies and equipment from the County, and, most importantly, the warden of the jail had some control over her conditions of employment. The contract between CMS and Allegheny County contained express language that provided the jail's warden with direct control over the independent contractor's personnel, allowed the warden to assign nurses to perform "additional duties" and gave the warden authority to direct the provision of medical services for a particular inmate. *Id.* at 521. The district court held these express contractual rights constituted sufficient proof of control by Allegheny County to support the inference that the nurse was a county employee. *Id.*

*Walker* is readily distinguishable from the case here. First, no express employment contract exists between Puskar and Westmoreland County. Providing Puskar with a copy of the prison manual and prison employees providing training about the policies and protocols of the prison does not constitute an express contract. Second, unlike here, the warden in *Walker* had the right to the terminate the plaintiff nurse, direct her in her performance of her nursing duties, and assign her additional duties. Neither Westmoreland County nor its employees at the prison were given such rights over Wexford employees. The Court recognizes that the Westmoreland County Prison Warden and his staff exercised some degree of control over Wexford employees' dispensation of medical care and medical treatment procedures (*e.g.*, ECF No. 63-1, p. 7), but that was necessarily within role of assuring that Wexford employees were operating consistent with Westmoreland County's security procedures and protocols for the prison. However, the contract specifically noted, "[t]he Warden and his staff will cooperate with WEXFORD to accomplish a mutually agreed resolution of any conflicts between proposed medical policies and

procedures and prison security and administrative concerns." (ECF No. 63-1, p. 7). In sum, the Court finds the fact that all Wexford employees assigned to the prison were obligated to follow the safety policies and procedures of the prison not to be a factor weighing in favor of Puskar being deemed a Westmoreland County employee.

The undisputed evidence does not support a conclusion that Westmoreland County could be considered an employer of Puskar. Puskar's relationship with Westmoreland County was defined by the terms of contract between Westmoreland County and Wexford. Wexford paid Puskar. Wexford hired Puskar and accepted her resignation. Lastly, and most importantly, Wexford maintained control over Puskar's daily nursing activities at the Westmoreland County Prison. The summary judgment evidence simply does not support Puskar's position that she was an employee of both Wexford and Westmoreland County. Wexford, not Westmoreland County, was Puskar's sole employer.

### IV. CONCLUSION

Defendant Westmoreland County's Motion for Summary Judgment (ECF No. 65) will be granted because no genuine issue of material fact exists – the parties have offered no contradictory evidence. The legal conclusion that can be drawn from the factual evidence is that Puskar was not engaged in an employment relationship with Westmoreland County. Puskar was not an employee of Westmoreland County for purposes of Title VII and the PHRA. Summary judgment will be granted in favor of Westmoreland County. Orders of Court will follow.

BY THE COURT:

/s/ William S. Stickman IV
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

8-27-21
Dated